In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 24-2432

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDLANDO M. WATSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:23-cr-00109-WCG-1 — **William C. Griesbach**, *Judge.*

_____

ARGUED SEPTEMBER 25, 2025 — DECIDED APRIL 2, 2026

_____

Before BRENNAN, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

BRENNAN, *Chief Judge*. The Second Amendment protects the right to keep and bear arms for self-defense. This right, Justice Story proclaimed, is "the palladium of the liberties of a republic." 2 Joseph Story, *Commentaries on the Constitution of the United States* 620 (4th ed. Boston, Little, Brown & Co. 1873). But the right is not unlimited.

We are asked to decide whether the federal felon in possession of a firearm law, 18 U.S.C. § 922(g)(1), is constitutional as applied to Edlando Watson, who has a prior felony conviction for possessing an illegal drug with intent to distribute it. As applied to Watson, this law is constitutional because his previous felony drug-dealing conviction is inherently dangerous. His disarmament is consistent with the history and tradition of Founding-era laws. But we do not decide whether an individual with a non-dangerous felony can be disarmed.

## I. Background

Early one morning in May 2022, Laquiesha Washington and her children rode by Uber to a home in Madison, Wisconsin. When they arrived, Washington got out and told the driver she needed to retrieve something from the residence but would be right back. After several minutes, Washington ran out of the door, yelling "pull out, pull out, he's coming with a gun!" As she jumped into the Uber, three shots rang out. The driver sped away and later flagged down police.

The next day police interviewed Washington. She said "Meek" had fired the shots. Madison Detective Joseph Buccellato recognized the nickname from Meek J's Masonry, owned by Edlando Watson. Washington gave police Meek's phone number, which matched the number on file for Watson.

Buccellato knew Watson lived at a nearby hotel. He secured a search warrant for the hotel room ("hotel warrant"). The hotel warrant authorized police to take a DNA cheek swab from Watson "and any other occupants of [the hotel room] at the time of warrant service." Police searched the hotel room and found photos of Watson.

About a month later, police arrested Watson. Buccellato then secured a search warrant for Watson's masonry business ("business warrant"). That warrant authorized police to take a DNA sample from Watson and "any other occupants of [the business] at the time of warrant service." A sample was taken from Watson at the police station.

The gun used in the shooting had yet to be located. Police spoke with Watson's ex-girlfriend, Lashundia Pearnell, who revealed that Watson had stashed guns in her storage unit but recently removed them. Then, an anonymous tipster told police that Linda Yarrington, the mother of Watson's child, was safekeeping Watson's gun in her storage locker. Police searched her unit and found several handguns and rifles. Male DNA collected off some of the guns matched the sample taken from Watson. Later, in recorded jail telephone calls to Yarrington's number, a female voice was heard telling Watson that police seized the guns, and Watson asked how police knew which unit to search.

Federal authorities then became involved. A grand jury indicted Watson under § 922(g)(1) as a felon in possession of a firearm. His previous felony convictions were for possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), and possession of a firearm by a drug user, 18 U.S.C. § 922(g)(3).

Watson moved to dismiss the indictment on the ground that § 922(g)(1) violates the Second Amendment. The district court denied the motion. He then argued that state police violated the Fourth Amendment by swabbing his cheek at the police station, so his DNA sample linking him to the guns in the storage unit should be suppressed in the federal case. Federal prosecutors defended the validity of the business

warrant, but for judicial economy they sought a new warrant ("federal warrant") to obtain a new DNA sample.

The federal warrant authorized police to swab Watson's cheek for DNA. Attached to that warrant was a probable cause affidavit detailing the evidence tying Watson to the guns found in the storage unit, including eyewitness accounts, witness statements, and Watson's own statements. The affidavit did not mention that Watson's DNA matched the DNA on the guns. Watson again moved to suppress the DNA evidence. He asserted that because federal authorities knew his DNA matched the DNA on the guns, the federal warrant was also unconstitutional.

The district court denied his second motion to suppress. The court reasoned that "[i]f, as Watson contends, state officials previously obtained a sample of his DNA illegally, that should not preclude federal officials from lawfully obtaining a separate sample using a warrant based on evidence that is untainted by the previous illegality." And significant evidence outside of Watson's DNA tied him to the guns in the locker: "Had Watson's DNA not already been available in the state case, the Government certainly would have obtained it in its investigation of the charges here."

Watson pleaded guilty to a single count of possessing firearms as a felon, in violation of §§ 922(g)(1) and 924(a)(8). That plea agreement preserved his right to appeal his Second Amendment and DNA suppression arguments. He timely appeals both.[1]

---

[1] The court thanks Ellen A. Matheson, Esq., and Eric G. Pearson, Esq., of Foley & Lardner LLP for their helpful assistance representing Watson in this appeal.

No. 24-2432                                                    5

On appeal of a district court's ruling of a motion to suppress, legal conclusions are reviewed de novo and factual findings for clear error. *United States v. Correa*, 908 F.3d 208, 214 (7th Cir. 2018). The same is true for Watson's Second Amendment challenge. *United States v. Viveros-Chavez*, 114 F.4th 618, 622 (7th Cir. 2024).

## II. The Fourth Amendment

Watson reads the business warrant as authorizing his DNA to be taken only at his business. After all, it reads, "[a] DNA buccal sample from Edlando Watson and any *other* occupants" of the business (emphasis added). But state police swabbed his cheek at the police station, which Watson now claims exceeds the scope of the business warrant. He admits federal authorities secured the federal warrant for his DNA. But to Watson, their knowledge that his DNA matched the DNA on the guns makes the federal warrant unlawful, as the bell cannot be unrung.

Evidence collected in violation of the Fourth Amendment may be suppressed under the exclusionary rule. *Mapp v. Ohio*, 367 U.S. 643, 657 (1961). But evidence lawfully discovered from an independent source is admissible. *Nix v. Williams*, 467 U.S. 431, 443 (1984). This "independent-source" exception applies "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one." *Murray v. United States*, 487 U.S. 533, 542 (1988).

The affidavit supporting the federal warrant provided more than enough evidence to implicate Watson and lawfully authorize the DNA swab that was taken:

- An eyewitness tied Watson to the shooting.

- Watson's ex-girlfriend Pearnell said Watson owned guns and recently moved them from her storage unit.

- A tipster told police Watson's gun was in Yarrington's unit. Watson and Yarrington knew each other.

- Multiple guns were found in the storage unit; those guns had male DNA on them.

- Police listened to recorded jail telephone calls in which a female voice was heard telling Watson that police seized the guns, and Watson asked how police knew which unit to search.

The federal warrant—which did not state that Watson's DNA was on the guns—is thus a lawful means of obtaining Watson's DNA, "genuinely independent" from any problems with the business warrant.

Compare this case to *United States v. Miller*, 68 F.4th 1065 (7th Cir. 2023). There, police responded to the scene of gunfire and found the defendant shot and holding a key fob to a car. *Id.* at 1066. After giving emergency aid, police pressed the button on the fob. It unlocked a nearby car, riddled with bullet holes, and with a firearm inside. *Id.* at 1067. Police later sought a warrant to search the car and attached a probable cause affidavit that did not mention the key fob. *Id.* The gun found inside was used to prosecute the defendant. *Id.* The defendant claimed pressing the button on the fob violated the Fourth Amendment, but the government argued the warrant provided an independent source. *Id.*

This court held that the independent-source doctrine applied for two reasons. *Id.* at 1070. First, the evidence about the

fob did not affect the decision to issue the warrant because "the warrant application did not mention the key fob at all." *Id.* Second, even though police knew the car belonged to the defendant because the key fob was in his hand and unlocked the nearby car, "[t]he car would have been searched regardless of the identity of its owner." *Id.* It had several bullet holes and a pool of blood near it. *Id.*

This case is like *Miller*. Here, the affidavit attached to the federal warrant did not state that Watson's DNA was on the guns. So, like the warrant in *Miller*, the DNA evidence "in no way affected the judge who signed the warrant." *Id.* And, given the extensive evidence tying Watson to the firearms in the storage unit, if state authorities had not already sought to collect Watson's DNA, federal authorities would likely have done so. Thus, his DNA evidence did not affect "the officers' decision to apply for the warrant." *Id.* We therefore reject Watson's Fourth Amendment challenge.

### III. The Second Amendment

At the outset, we highlight that Watson argues § 922(g)(1) violates the Second Amendment as applied to him. This challenge and requested relief does not reach beyond his circumstances. *See Spence v. State of Washington*, 418 U.S. 405, 414 (1974) (A law may be constitutional in some circumstances but "nonetheless unconstitutional as applied to appellant's activity."). By contrast, a facial challenge is a claim that § 922(g)(1) is unconstitutional in all its applications, to Watson and all other felons. *See Lukaszczyk v. Cook County*, 137 F.4th 671, 673–74 (7th Cir. 2025). Given the difference between the challenges, the felony crimes that Watson has been convicted of are important to our analysis.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. amend II. That individual right, however, does not extend to everyone. Illegal aliens may be disarmed. *United States v. Carbajal-Flores*, 143 F.4th 877, 887 (7th Cir. 2025), *cert. denied*, 146 S. Ct. 826 (2025). The Supreme Court also rejected a facial challenge to 18 U.S.C. § 922(g)(8) from Zackey Rahimi, a domestic abuser who fired a gun in the air while dining "[w]hen the restaurant declined his friend's credit card." *United States v. Rahimi*, 602 U.S. 680, 688 (2024). Rahimi posed "a clear threat of physical violence to another." *Id*. at 698. And this court recently held that § 922(g)(3) was constitutional as applied to a habitual user of heroin and crack cocaine. *United States v. Seiwert*, 152 F.4th 854, 859, 872 (7th Cir. 2025).

The question here is whether Watson's permanent disarmament is consistent with the Second Amendment. We first explain why dicta from *District of Columbia v. Heller*, 554 U.S. 570 (2008), does not resolve that question. Then, we undertake the history and tradition analysis laid out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).

## A. *Heller* dicta

The government assures us a *Bruen* analysis is unnecessary because *Heller* already foreclosed as applied challenges to § 922(g)(1). To be sure, *Heller* cautioned, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. And *Bruen* and *Rahimi* did not cast doubt on that conclusion. Indeed, they reaffirmed *Heller's* core holding. So, the government submits, the dicta from *Heller* should bind us and obviate the need to evaluate § 922(g)(1) challenges under *Bruen*.

No. 24-2432                                                  9

But this court has already rejected that argument. *See At-kinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Heller* does not resolve the basket of questions raised in § 922(g)(1) challenges. Further, in *Bruen* the Court "rolled up its sleeves and examined a wealth of laws and commentary spanning several centuries, paying close attention to the enforcement and impact of various regulations." *Id.* The Court did the same in *Rahimi*, rejecting a facial challenge to § 922(g)(8) based on historical surety laws and "going armed" laws. 602 U.S. at 698.[2] Recently, this court in *Seiwert* declined to rely on its § 922(g)(3) precedent that did not include a historical analysis. 152 F.4th at 861–62 ("[W]e must take a fresh look employing *Bruen*'s text-and-history framework."). Thus, just as with *Bruen*, *Rahimi*, and *Seiwert*, the constitutionality of § 922(g)(1) as applied to Watson must be evaluated under the history and tradition analysis.

First, we examine whether Waston's conduct falls under the plain text of the Second Amendment. Second, we resolve whether § 922(g)(1) as applied to Watson is "consistent with the principles that underpin our [Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692.

**B. Felons as "the people"**

*Bruen*'s first step asks whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. All agree Watson, at one point, bore an "Arm." But the government submits that felons are not among "the people" who have the right to bear arms.

_____

[2] Though *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024), rejected a Second Amendment challenge to § 922(g)(1) based on *Heller*'s dicta, that case predated *Rahimi*.

*Heller* tells us "the people" "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. That aligns with what the Court said earlier in *United States v. Verdugo-Urquidez*: "'the people' seems to have been a term of art employed in select parts of the Constitution … to refer to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. 259, 265 (1990) (citation modified). Founding-era sources define "people" as "the whole Body of Persons who live in a Country[ ] or make up a Nation." N. Bailey, An Universal Etymological English Dictionary 601–02 (22d ed. 1770). "Citizen" was also used synonymously with "the people." *See e.g.*, The Federalist No. 2, at 10 (John Jay) (Jacob E. Cooke ed. 1961) ("To all general purposes we have uniformly been one people each individual citizen everywhere enjoying the same national rights, privileges, and protection.").[3]

Thus—without providing a conclusive definition—we can say the phrase "the people" at least encompasses citizens, which includes felons. Several circuits agree. *United States v. Duarte*, 137 F.4th 743, 754–55 (9th Cir. 2025) (en banc), *cert. denied*, 2026 WL 135692, at *1 (2026); *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc); *Zherka v. Bondi*, 140

---

[3] *See also* The Federalist No. 14 (James Madison) ("Hearken not to the unnatural voice which tells you that the people of America … can no longer be fellow citizens of one great, respectable, and flourishing empire." (citation modified)); *Douglass v. Stephens*, 1 Del. Ch. 465, 467 (1821) ("[T]he people of the United States … resist[ed] the … British King and Parliament. They united and acted in concert, as one people … [T]hey knew that they were practically, as well as legally, fellow-citizens, … enjoying every right and privilege indiscriminately with the inhabitants.").

F.4th 68, 77 (2d Cir. 2025), *cert. denied*, 2026 WL 135708, at *1 (2026); *United States v. Kimble*, 142 F.4th 308, 311 (5th Cir. 2025), *cert. denied*, 2026 WL 135675, at *1 (2026).

The government points out that felons have historically been denied the right to vote, serve on juries, and hold public office. Because the state can strip those political rights from felons, those individuals are not members of the "political community" as stated in *Heller*. 554 U.S. at 580. And historical sources link voting with gun ownership: "[T]he Pennsylvania Test Acts … stripped citizens of certain civic rights, such as the right to bear arms or sit on juries, but did not deprive them of fundamental individual rights such as the right of freedom of conscience or the right to publish their sentiments on public matters." Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002). If the state has the power to rescind voting rights, so too with gun rights.

Jurists have observed, though, a distinction between collective and individual rights. Voting, serving on juries, and holding office are collective rights, exercised for the benefit for the polity. *Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting) ("[T]he right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance."). By contrast, felons were not historically deprived of their individual rights—a felon could attend church or join a protest, and he retained his criminal procedure rights if later accused and tried. *Heller* holds that owning a firearm is an individual right, 554 U.S. at 635. So, if the individual/collective rights distinction is correct, felons are part of "the people" even though they could not vote.

This question is admittedly difficult. To our knowledge, courts and historians have not resolved it. *Duarte*, 137 F.4th at 752–54 (observing the "conflicting interpretations of history"). So, faced with conflicting historical evidence, we adhere to *Heller*'s language until the Supreme Court tells us differently.

Felons, then, are part of "the people" as members of our national "political community." *Heller*, 554 U.S. at 580. That conclusion aligns us with the other circuits. *Duarte*, 137 F.4th at 754 ("[I]n the face of these conflicting interpretations of history, we adhere to the Supreme Court's definition of 'the people,' which does not exclude felons."); *Zherka*, 140 F.4th at 77 ("Zherka, notwithstanding his felony conviction, is among 'the people' protected by the Second Amendment."); *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) ("Williams is a member of the people claiming 'the right' to possess a gun"); *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024) (presuming the felons count as "the people"), *cert. denied*, 145 S. Ct. 2708 (2025).

We move now to *Bruen*'s second step.

**C. History and tradition**

Because the Constitution presumptively protects Watson's conduct, the government has the burden to show that § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

To date, courts and scholars have identified few if any Founding-era felon in possession laws. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). But that is not the end of the matter. A contemporary regulation must only be "relevantly similar" to a historical regulation. *Bruen*, 597 U.S. at 29. A "dead

ringer" or "historical *twin*" is unnecessary. *Id.* at 30. Just so, courts cannot compare restrictions at too high a level of generality—for example, that both serve "public safety"—because, after all, "[e]verything is similar in infinite ways to everything else." Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 774 (1993); *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (warning against reading a "principle at such a high level of generality that it waters down the right").

The Supreme Court has not spoken to the appropriate level of generality for this inquiry, as it has in other contexts. *See, e.g.*, *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (in the qualified immunity context, "existing precedent must have placed the statutory or constitutional question beyond debate"); *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (in the habeas context, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). But the Court has told us to consider the "[w]hy and how" of the historical and contemporary regulation. *Rahimi*, 602 U.S. at 692. And the focus is on "the principles underlying the Second Amendment." *Id.* *Rahimi* also gave us an example of the appropriate level of generality, describing historical surety and going armed laws as restrictions on "individuals … threaten[ing] the physical safety of another." *Id.* at 698.

Also important for our inquiry is that more than one kind of historical regulation may justify a single contemporary law. *Rahimi* concluded that surety laws and going armed laws, "[t]aken together," are relevantly similar to § 922(g)(8). *Id.*

This tells us that the government may point to more than one "distinct legal regime" to justify a contemporary regulation. *Id.* at 694.

The history and tradition analysis is not without its challenges. *Rahimi*, 602 U.S. at 734 (Kavanaugh, J., concurring) ("The historical approach is not perfect."). For example, the circuits have relied on laws that disarmed disfavored groups, laws that would certainly be unconstitutional today. It is unclear whether that is permissible. *Id.* at 723 ("[I]n using pre-ratification history, courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind."). And when performing a historical analysis, we are told to consider "the principles that underpin our regulatory tradition." *Id.* at 692. But at what level of generality courts should operate is also unclear. *See United States v. Morton*, 123 F.4th 492, 497 n.2 (6th Cir. 2024) ("[D]epending on how broadly a court draws the analogy, a tradition of disarming potentially rebellious groups arguably would not map on to our modern felon-in-possession statute.").

With the guidance we have, and trying our best to navigate these difficulties, we see two enduring traditions that merit consideration. First, legislatures deemed groups "dangerous" and categorically disarmed them. Second, legislatures established as punishment the death penalty for violent felony convictions. The greater power to execute necessarily includes the lesser power to disarm. "Taken together," these traditions support disarming those with dangerous felonies. *United States v. Dubois*, 139 F.4th 887, 894 (11th Cir. 2025) (Pryor, C.J., concurring), *cert. denied*, 2026 WL 135685, at *1 (2026).

### 1. Bans on groups legislatures deemed dangerous

Start with English common-law traditions. Throughout its history, England's rulers viewed opposition groups—whether religious, political, or ethnic—as rebellious. The best way to quash a rebellion before it began was to disarm dissident groups. For example, Catholics, considered seditious and obedient to the Pope, were forbidden from owning arms. *Carbajal-Flores*, 143 F.4th at 884. "Popish Recusants" had their "Armour, Gunpowder, and Munition" seized by King James I in 1610. 1 STUART ROYAL PROCLAMATIONS: ROYAL PROCLAMATIONS OF KING JAMES 1, 1603–1625, 247–48 (June 2, 1610). After the English Civil War, the Catholic-sympathetic Charles II was restored as King. He and his younger brother, James II, targeted "dangerous and disaffected persons"—those believed to be disloyal, including non-Anglican Protestants. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 259 (2020). And "[u]nder the auspices of the 1671 Game Act, for example, the Catholic Charles II had ordered general disarmaments of regions home to his Protestant enemies." *Heller*, 554 U.S. at 593. Later, after the Glorious Revolution and King James II lost his throne, King William III, Prince of Orange, and Queen Mary II targeted Catholics. Those who refused to declare themselves as non-Catholic had their arms seized. Greenlee, *supra*, at 260–61 (collecting examples).

Political dissidents, too, were often disarmed because they either threatened rebellion or did rebel. During Owain Glyndŵr's 15th century Welsh revolt against the English, King Henry IV imposed harsh conditions on the Welsh people. That included a prohibition on any "Welshmen from henceforth bear[ing] any manner of armour with such city." 2

Henry IV ch. 12 (1400-01). Later, those opposing the Stuart Kings in the 17th century, Charles II and James II, were disarmed. JOYCE LEE MALCOM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 31–53 (1994). And after the Glorious Revolution, those Tories previously loyal to the Stuart Kings were disarmed by William and Mary. Greenlee, *supra* at 259.

Additionally, "land and gun ownership were historically linked." *Carbajal-Flores*, 143 F.4th at 883. The common-law rule was that all "persons may hold lands, except aliens." *Id.* (quoting *M'llvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280, 297 (1805)). Landownership related to the idea of allegiance to the English monarchy—one who did not own land felt no attachment to the monarchy's success. A similar concern "also warranted barring [those without land] from keeping arms." *Id.* at 883–84.

This pre-Founding history teaches that English sovereigns categorically disarmed groups thought "to threaten the physical safety of another." *Rahimi*, 602 U.S. at 698. Whether rebelling like the Welsh, or perceived as threatening rebellion like the Catholics, such groups threatened public safety and stability—in other words, they were "dangerous." Though we do not place undue weight on this history, this "unbroken line of common-law precedent" illuminates our inquiry. *Bruen*, 597 U.S. at 35; *Carbajal-Flores*, 143 F.4th at 883.

Across the Atlantic in pre- and post-Founding America, the tradition of disarming those viewed as dangerous to society continued. "Slaves and Native Americans … were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). States like Virginia,

Maryland, and Pennsylvania continued the tradition of disarming Catholics. *Carbajal-Flores*, 143 F.4th at 885; *Range*, 124 F.4th at 258–59 (Krause, J., concurring in the judgment). Loyalists, too, were disarmed because of their perceived threat against the Revolution. *Carbajal-Flores*, 143 F.4th at 886.

Some of these ignominious class-wide bans were categorical restrictions. For example, for black people, there were narrow exceptions extended to "house-keepers" who were free or of mixed race, and all those living on a frontier plantation. Otherwise, black people could not carry arms.[4] Many colonies also restricted the sale of firearms and ammunition to Indians as a class.[5]

---

[4] Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government, 187 (The Making of Modern Law: Primary Sources through 1803); An Act Directing the Trial of Slaves Committing Capital Crimes, §§ 14–15, VA. CODE (W. W. Gray 1820); A Law Respecting Slaves, § 4, 1804 LA. TERRITORY ACTS 107, 108 (E. Stout 1804). *See also* An Act to Restrain the Evil Practices Arising from Negroes Keeping Dogs, and to Prohibit Them From Carrying Guns or Offensive Weapons, ch. 81, §§ 1-2, 1806 MD. LAWS 46, 47 (1806 statute exempting free black and mixed race people but not slaves); An Act Prescribing the Rules and Conduct to Be Observed with Respect to Negroes and Other Slaves of This Territory, §§ 19–21, LA STAT (passed 1806 stating, "No slave shall … carry any visible or hidden arms, not even with a permission for so doing ); *see also* *Zherka*, 140 F.4th at 87–88 (1723 Virginia and 1852 Mississippi statutes).

[5] *Duarte*, 137 F.4th at 765 (Collins, J., concurring) (collecting examples); An Order Directed to the Comittee (sic) of Scittuate, MASS. GEN. LAWS (William White 1856) (1675 Plymouth Colony order prescribing death penalty for selling weapons to Indians); An Act for Preventing Lending Guns, Ammunition, &c. to the Indians, 1723 Conn. Acts 292, 292 (T. Green) (1723 Connecticut Act); An Act to Prohibit the Selling of Guns,

The trend of class-wide disarmament continued into the mid-1800s. In that timeframe, states faced the growing social problem of homeless, wandering, or destitute people. Dozens of laws were enacted that categorically prohibited tramps from possessing firearms, often without exception.[6] Ohio's Supreme Court upheld its law disarming tramps, writing that the Second Amendment "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900). States also continued to ban black people from owning any firearms. *Zherka*, 140 F.4th at 88 n.50 (collecting examples). "Black

---

Gunpowder, or Other Warlike Stores, to the Indians, PA. TERRITORY LAWS, 306, 306-7 (B. Franklin 1763) (PA law).

[6] Act of May 3, 1890, §4, 1890 IOWA ACTS 68, 68-69 (G. H. Ragsdale) ("Any tramp … who shall be found carrying any firearm or other dangerous weapon, shall be punished by imprisonment."); An Act Concerning Tramps, ch. 806, §§ 1-9, 1880 R.I. PUB. LAWS 110, 110-111 (E. L. Freeman & Co.) ("Any tramp who … shall be found carrying any firearm … shall be punished by imprisonment."); An Act to Punish Tramps, ch. 213, §§ 1-2, 1880 ME. LAWS, 212, 212-213 (Sprague & Son 1880); An Act Concerning Tramps, ch. 155, §§ 6 & 8, 1879 DEL. LAWS 223, 224-225 (The Delawarean Office 1879) ("Any tramp … who shall be found carrying any firearm or other dangerous weapon … shall be guilty of a misdemeanor, and punished accordingly"); An Act to Define and Suppress Tramps, Bill no. 243, §§ 1-5, 1879 OHIO LAWS 191, 191-192 (Nevins & Myers 1879)("That any tramp who … shall be found carrying any fire-arms … be imprisoned"); An Act to Suppress Vagabondage, ch. 188, § 4, 1879 WIS. SESS. LAWS 273, 274 (David Atwood) ("Any tramp who shall … carry any fire-arms or other dangerous weapon, shall, on conviction thereof, be punished at hard labor"); An Act to Punish Tramps, ch. 38, § 2, 1878 N.H. LAWS 170, 170 (Josiah B. Sanborn 1878); An Act Relating to Tramps, no. 14, § 3, 1878 VT. ACTS & RESOLVES 29, 30 (J & J.M. Poland 1878).

people in Mississippi were prohibited from owning guns with no exceptions." *Id.*

We draw two important conclusions from this history. First, this sad tradition includes laws repugnant by today's standards. Many of these laws would violate the Fourteenth Amendment. Yet, for this analysis their import cannot be ignored. These laws reflect the boundaries of the legislature's power to enact class-wide disarmament laws consistent with the Second Amendment. *Duarte*, 137 F.4th at 767 (Collins, J., concurring) (This "historical tradition recognizes some measure of legislative discretion to impose disarmament on particular categories of persons who are thought to present a 'special danger of misuse.'" (citation modified)).

Second, as noted, these disarmament laws sometimes included exceptions, and other times they did not. In some states, a slave could own a gun if he could prove he was an "orderly and peaceable person" or needed the firearm to hunt. *Williams*, 113 F.4th at 656. But other states, particularly in the South, categorically prohibited slaves from owning guns. *See supra* n.4. Consider, too, a Pennsylvania law disarming Catholics, which provided no method to get their guns back.[7] *See also Zherka*, 140 F.4th at 91 (identifying categorical bans). As a result, the legislature may determine that classes of people are dangerous.

---

[7] An Act for Forming and Regulating the Militia of the Province of Pennsylvania, 627, PA. CONS. STAT. (WM Stanley Ray 1898) (PA Law Passed 1757) ("That all arms, military accoutrements, gunpowder and ammunition of what kind soever, any papist or reputed papist within this province hath or shall have in his house or houses or elsewhere one month after the publication of this act, shall be taken from such papist or reputed papist.").

### 2. Greater includes the lesser

The second tradition concerns the penalty for felonies. At the Founding, a felony charge was "generally connected with that of capital punishment." 4 WILLIAM BLACKSTONE, COMMENTARIES *98. *See also Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (At the Founding, death was "the standard penalty for all serious crimes."). Execution was the penalty for serious crimes, like treason, murder, arson, burglary, robbery, rape, and larceny. *Dubois*, 139 F.4th at 895 (Pryor, C.J., concurring). And the "death penalty was also a commonplace punishment for criminal recidivism in early America." Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. RICH. L. REV. 693, 694 (2015). Dictionaries, too, defined "felony" to be a category of crimes punishable by death. *Duarte*, 137 F.4th at 769–70 (Collins, J., concurring) (collecting examples). In short, "relaxed Virginia Anglicans like Thomas Jefferson and James Madison or dour Calvinist New Englanders like Fisher Ames and the Adamses would have likely seen the death penalty not only as historically commonplace but as intrinsically just and … divinely prescribed." JOSEPH A. MELUSKY & KEITH A. PESTO, CRUEL AND UNUSUAL PUNISHMENT: RIGHTS AND LIBERTIES UNDER THE LAW 30 (2003).

This tradition highlights that when the Second Amendment was adopted, legislatures could define a "serious" crime as a felony and impose the death penalty. Crimes involving danger to persons or society (murder, rape, and treason) were often labeled as felonies. If those convicted of dangerous crimes received the greatest possible punishment, the legislature may instead impose disarmament, the "lesser restriction." *Rahimi*, 602 U.S. at 699.

Some believe this "greater includes the lesser" theory rests on shaky historical footing. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("During the period leading up to the [F]ounding, the connection between felonies and capital punishment started to fray."); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 920 (3d Cir. 2020) (Bibas, J., dissenting). But that a legislature rarely imposed the death penalty for felonies does not mean it could not have done so for all felonies, if it wished. After all, we cannot assume "[F]ounding-era legislatures maximally exercised their power to regulate." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring). The states' power to execute is not subject to the "use it or lose it" rule. *Id.* What is more, executions for felony convictions apparently occurred often. "Between 1790 to 1829 … the states carried out an estimated 779 executions, and did so for crimes against people (e.g., murder and rape) [and] property (e.g., arson, forgery, and horse stealing)." Hannah Freedman, *The Modern Federal Death Penalty: A Cruel and Unusual Punishment*, 107 Cornell L. Rev. 1689, 1709 (2022). Indeed, the "death penalty was an accepted punishment at the time of the adoption of the Constitution and the Bill of Rights." *Glossip v. Gross*, 576 U.S. 863, 867 (2015).

This theory has not been conclusively accepted. Yet *Rahimi* does employ it: "The going armed laws provided for imprisonment, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 602 U.S. at 699. Since *Rahimi*, other circuits have debated the theory. *Compare Duarte*, 137 F.4th at 768, 771 (Collins, J., concurring), *with id.* at 790 (VanDyke, J., concurring). And some circuits have cited this rationale in rejecting all as-applied challenges to

§ 922(g)(1). *Id.* at 756; *Jackson*, 110 F.4th at 1127; *Dubois*, 139 F.4th at 897 (Pryor, C.J., concurring); *Zherka*, 140 F.4th at 82.

When considered along with the historical disarmament laws, the theory provides some historical support that the legislature had the power to permanently disarm dangerous felons.

**D. Watson's as-applied challenge**

The categorical disarmament laws "confirm what common sense suggests": individuals convicted of dangerous felonies pose a risk to society and may be disarmed consistent with the Second Amendment. *Rahimi*, 602 U.S. at 698. Section 922(g)(1), then, as applied to Watson, fits within that tradition. Exercising its authority like state legislatures at the Founding, Congress reasonably determined that a felony drug conviction is a "dangerous" crime. That link makes "common sense." *Id.* Federal caselaw well substantiates that drugs and guns together are dangerous. *See, e.g.*, *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 287 (2025) (Cartels "use the imported firearms to commit serious crimes— drug dealing, kidnapping, murder, and others."); *Muscarello v. United States*, 524 U.S. 125, 132 (1998) ("the 'dangerous combination' of 'drugs and guns'"); *Richards v. Wisconsin*, 520 U.S. 385, 391 n.2 (1997) (There is a "link[] between drugs and violence.").

The view that guns and drugs together are dangerous is also reflected in other laws, like 18 U.S.C. § 924(c), which imposes significant prison time for using a firearm during a drug offense. Consider the U.S. Sentencing Guidelines, too, which increase sentences for possessing a firearm during a drug offense. § 2D1.1(b)(1). We also note that the Court in

*Rahimi* rejected the argument that a person could be disarmed merely for being irresponsible. 602 U.S. at 701–02. A dealer of illegal drugs is more than just irresponsible; he is a threat to the physical safety of society.

Congress made the common-sense decision to disarm drug dealers like Watson because they are dangerous. History allows for that. *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). Watson's predicate felony drug dealing conviction is sufficient to lawfully disarm him.[8]

The historical disarmament laws support disarming Watson and other dangerous felons. And until the Supreme Court provides further guidance, the "greater includes the lesser" theory fortifies that conclusion. These two enduring traditions "taken together," *see, e.g.*, *Dubois*, 139 F.4th at 897 (Pryor, C.J., concurring), lead us to uphold § 922(g)(1) as applied to dangerous felons based on the recognized power of the states to disarm dangerous felons.

Watson has a second felony conviction for possessing a firearm while being an unlawful user of a controlled substance. § 922(g)(3). Whether that predicate felony may be enough to disarm Watson is a thorny question. On one hand, Congress reasonably could have determined that a prior

---

[8] The government argues the entirety of Watson's criminal history, not just his prior felony convictions, shows he is "dangerous" and can thus be disarmed. It is not necessary to decide here whether a defendant's entire profile can or should be considered. Watson's predicate felony, which provides the basis for Watson's disarmament under § 922(g)(1), shows him to be dangerous.

violation of federal gun laws suggests one will misuse fire-arms again. *See Seiwert*, 152 F.4th at 866. On the other hand, the Supreme Court may allow as-applied challenges under § 922(g)(3). *See United States v. Hemani,* No. 24-40137, 2025 WL 354982 (5th Cir. Jan. 31, 2025) (per curiam), *cert. granted*, 146 S. Ct. 326 (2025). If so, Watson's § 922(g)(3) conviction, at the time, could have been vacated under an as-applied challenge. His vacated conviction could not have served as a predicate felony under § 922(g)(1).

This appeal does not concern whether Congress may deem non-violent felons "dangerous." That question has split the courts of appeals. Some have held that no as-applied challenge can succeed under § 922(g)(1). "[T]here is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Jackson*, 110 F.4th at 1125.[9] That is because historical laws did not always require an individualized determination of dangerousness. *See Dubois*, 139 F.4th at 898 (Pryor, C.J.); *Duarte*, 137 F.4th 771 (Collins, J., concurring in the judgment); *Zherka*, 140 F.4th at 91 ("Although some of the historical laws created such an exemption structure, not all of them did."). But other courts have identified successful as-applied challenges. *Range*, 124 F.4th at 228; *Williams*, 113 F.4th at 657; *United States v. Mitchell*, 160 F.4th 169, 194 (5th Cir. 2025) ("[W]e hold that § 922(g)(1) is unconstitutional as applied to Mitchell's § 922(g)(3) predicate offense."). We reserve ruling on an as-applied challenge to § 922(g)(1) under the Second

---

[9] In reaching that conclusion, some courts have relied on their pre-*Bruen* and *Rahimi* precedent. *See United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024); *Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025), *cert. denied*, 2026 WL 568283, at *1 (2026).

Amendment by a felon whose predicate felony offense is not "dangerous."

Finally, felon status does not necessarily mean permanent disarmament. Under 18 U.S.C. § 925(c), a person may apply to the Attorney General for relief from federal firearm disarmament if the applicant shows he "will not be likely to act in a manner dangerous to public safety" and "the granting of the relief would not be contrary to the public interest." *Id.* The procedure was effectively disabled after Congress barred the Bureau of Alcohol, Tobacco, Firearms, and Explosives from using funds to evaluate applications. *See United States v. Bean*, 537 U.S. 71, 74 (2002). The current Attorney General has rescinded the delegation of authority to the ATF and has begun to restart the 925(c) process. *Withdrawing the Attorney General's Delegation of Authority*, 90 Fed. Reg. 13080 (Mar. 20, 2025). Though Watson did not apply under § 925(c), other felons may do so.

### IV. Conclusion

Section 922(g)(1)'s disarmament of dangerous felons is constitutional under the Second Amendment. Watson's predicate felony—possession of cocaine with intent to distribute it—is a dangerous felony. His as-applied challenge therefore fails.

AFFIRMED